Milligan, J.,
delivered tbe opinion of the Court.
On the 26th of March, 1847, the defendant’s intestate, Benjamin P. Persons, made and executed a deed in trust, to the complainant, W. H. Bedford, whereby he conveyed to the trustee, four slaves, viz: Nelson, Amy, John, and Cynthia, for the “ sole use, benefit and comfortable support” of two colored women, called Letitia and Emily. It is stipulated in the deed, that the slaves, Nelson and Amy, shall be held for the benefit of Letitia; and John and Cynthia, for the girl, Emily, who is described in the deed as the daughter of Letitia. The trusts are for the separate lives of the cestues que trust, with the condition, if Emily shall survive her mother, then all the slaves are to be held for the use and support of the former; and vice versa, for the use and support of the latter, during her life, and for the support and maintenance of the child or children of the said Emily; and after the death of both of the original beneficiaries, Letitia and Emily, then, for the support and maintenance of the children of the latter, now born, or hereafter to be born. In default of Emily’s having child or children living at the death of both of the original beneficiaries, then said slaves are to be held in trust for one Erancis Lewis, and his heirs; and the trustee is required to convey them to Lewis, or his heirs.
In addition to the foregoing provisions, the deed further provides: “If, at any time after the date of *204 this instrument, Letitia or Emily should wish any, or all of said slaves hereby conveyed for their benefit and use, respectively, sold, and other slaves bought in jilace of them; or, if either or both of them should prefer to have the money got for any or all of said slaves held for her or their use, then I authorize my said trustee, Vm. H. Bedford, or his assigns, to sell all, or any part of said slaves, and invest the proceeds as' said Letitia or Emily, or both of them, may desire; or hold the money for their use, if they so desire; and should said slaves be sold, as here contemplated, then said trustee, or his assigns, is to hold the money or property in which the proceeds may be invested, upon the trusts above expressed.”
Some time after the execution of this deed, the slaves Amy and Cynthia went into the possession of the beneficiaries in the trust; and in 1858, the defendant’s intestate, Persons, sold, and by bill of sale, transferred, Nelson and John, together with some sixteen other slaves — all he then owned — to one J. B. Taylor, for the sum of §10,000. Taylor, as it seems, sold Nelson, and perhaps some others, to a man by the name of Chilton, who afterwards re-sold him to the defendant’s intestate, Benj. P. Persons, who as it is shown, died in 1860, leaving the boy, Nelson, in the hands of the administrator.
It also appears, that Chilton sold John about the same time he sold Nelson, to one Tearell, who removed him to the State of Mississippi, where, so far as this record discloses the facts, he remained until his emancipation.
*205 Under this general state of facts, this bill was brought by the trustee, and the girl Emily, the surviving beneficiary in the trust, to recover the value of the slave, John, with the interest thereon from the date at which he was sold to Taylor, and also the hire of the slaves, Nelson and John, for the time they were in the custody and control of Persons, after the date of the trust deed.'
The bill charges, that Letitia is dead, and that she was the mother of the complainant, Emily, who is the illegitimate child of the intestate, Persons, and for whom he had a strong affection, and desired that she should share largely in his estate. It is also alleged, that he, at all times, recognized the slaves conveyed in the trust, as belonging to the trustee, for the purposes declared in the deed, and regarded himself as responsible for their hire while under his control. It is further alleged, that he was induced to sell the slaves conveyed to Taylor, to avoid the result of an evil and wicked combination against him and his property, and that he received the sum of $1,000 for John, which is still in the hands of his administrator.
The answer of the administrator admits the execution of the trust on the 26th of March, 1847, and that the slaves, Amy and Cynthia, went into the possession of the complainants in the lifetime of the intestate, Persons; but, upon information, the defendant denies that Persons ever recognized the right of the trustee, or the beneficiaries in the deed, to the custody and control of the slaves, Nelson and John, or admitted that he was responsible for their hire, or the consideration for which John was sold.
*206 It is also admitted that the defendant’s intestate divested himself of all his property in 1858, to avoid the legal consequences of some actions of slander that were instituted against him; and that the hill of sale to Taylor conveyed all the negroes he owned at that time.
The defendant also pleads and relies on the statute of limitations of three and six years, as well against the claim of hire, as for the value of the slave, John.
The proof is somewhat voluminous, hut it is unnecessary to notice more of it, than to remark, that it establishes the fact that the complainant was the reputed daughter of the intestate, and that he publicly acknowledged her as such, and at all times manifested great tenderness and affection for her. It further appears that her mother, Letitia, was the slave of Persons, and that she died without any formal emancipation; but that many years before her death, she and her daughter lived in a separate house, and her master lived and cohabited with her as husband and wife, and in every respect, treated her as a free woman.
The Chancellor decreed for the complainant; from which there is an appeal prosecuted to this Court. •
The principal question relied on, under this state of facts, is, that, by the laws of this State, as they existed prior to the abolition of slavery, persons held to servitude or labor, were incapable of holding property of any kind, except such articles as were allowed by statute; and consequently they were equally incapable of taking as beneficiaries, under a deed of - trust.
The question raised in argument is not properly presented in the pleadings. It is no where alleged, either *207 in the bill or answer, that either the colored woman, Letitia, or her daughter, Emily, were at any time, the slaves of the intestate, or any one else. The fact appears in the proof and not otherwise in the entire record, and as a general rule of chancery practice, a Court of Equity can make no decree on the proof alone, the facts constituting the case upon which the decree is sought, not having been set forth either in the bill or answer. Every decree must be founded on, and. be in conformity to, the allegations and proof, and cannot be based upon a fact not put in issue by the pleadings. But, as a rule of chancery pleadings, the same strictness is not required in Courts of Equity as at law: Cocke vs. Trotter, 10 Yerg., 213-217; 10 Wheaton, 181; 1 Barber’s Prac., 339; Cunningham vs. Wood, 4 Hum., 417-420.
But, independent of this defect in pleading, the position assumed in argument, as applied to this case, cannot be sustained. It is true, as a general proposition, a slave, as the institution existed in Tennessee prior to the late war, could not hold property. He, and everything of his earnings, belonged to his master; and he could not, therefore, make contracts which were obligatory on himself or the persons contracted with: University vs. Cambreling, 6 Yer., 84; Fletcher vs. The State, 6 Hum., 256; Jenkins vs. Brown, 6 Hum., 299; Hite vs. The State, 9 Yer., 207.
Admitting the principles as recognized in the above' recited cases, a very different question is presented in the facts and circumstances of this case. By the common law, there is no question but the master might *208 manumit bis own slave bj parol, or even by implication, from acts in pais: 2 Black. Com., 95. Judge Green, while commenting on this common law principle, in the case of Greenlaw vs. Rawlings, 3 Hum., 92, says: “And in this country, independent of statutory prohibitions, the same principle exists. No deed or writing of any kind, is necessary for the purpose of parting with the master’s right. In fact, acts in pais, from which freedom might be implied, have been held sufficient:” Citing 9 John. R., 144; 14 John. R., 192; 1 Cowan’s R., 127; 7 John., 331. See, also, Lewis vs. Simonton, 186.
But the State has an interest in the character of its citizens, and therefore it has an undoubted right to regulate, by law, the manner of introducing new members into its free community. Hence, the Legislature, to guard against such persons becoming a charge upon the public, has repeatedly provided by law, that, before manumission can become complete, the assent of the State must be obtained. But, after the master or owner has parted with the right of property in the slave, either upon terms of the common law, or by Will, or contract — written or in parol — entered into directly between the master and his slave, upon consideration moving from the slave to the master, or a stranger on behalf of the slave, what was the status of such slave before the assent of the State was obtained? It is well settled by our Courts, that his relations to his former master or owner, as well as to the community, are wholly changed. He owes no service or labor to his former owner, or to any one else. And if he voluntarily goes to another State in this con *209 dition, where slavery is not recognized, he violates no law of this State or of the United States, and thereby, to all intents and purposes, becomes free. In this intermediate state between freedom and slavery, or rather, as the law formerly existed, a qualified citizenship and bondage, he has an inchoate right to freedom, and no one can interpose any objection to its assertion but the State. He is free to enjoy the fruits of his own labor, and after the assent of the State is given to his manumission, he may sue for and collect a note given him in the interval between the time at which his former master vested him with the right of freedom and its final consummation. And why should he not have capacity to support a trust made in his favor during this period? We think, especially in a Court of Equity, there is no reason or authority to the contrary: Lewis vs. Simonton, 8 Hum., 185. It is clear in such case, his freedom by relation, must be held to extend to the time when the right first accrued; and upon this principle, this Court has held he could, after the consummation of his freedom, take both real and personal property devised to him by his former owner; much more can he .support a trufet in his favor, the trustee assenting thereto, after he has obtained the consent of the sovereign to his manumission: Lewis vs. Simonton, 8 Hum., 186; Laura Jane vs. Hogan, 10 Hum., 332; McCloud & Karnes, Ex’rs, vs. Childs et al., 1 Cold., 248; Rose Porter, by next friend, vs. Blakemore, Adm’r, et al., 2 Cold., 556; Nelson & Smithpeter, Ex’rs, vs. William and Hiram Smithpeter, 2 Cold., 13; Banks vs. Banks, 2 Cold., 546.
*210 Applying these principles to the case under consideration, there can he no douht, at common law, the acts and conduct of the intestate towards the women, Letitia and Emily, would have been sufficient to have vested them with an inchoate right to freedom; and if so, under the authorities already cited, as well as the case of Abram, a man of color, vs. Johnson et al., 1 Head, 120, it is clear that the acts and conduct of the intestate, Persons, by implication of law, vested them with a right to manumission, and thereby conferred upon them the legal capacity to support the trust in question, which their former owner had freely and voluntarily conferred upon them; and had the institution of slavery remained in the State, it would probably have been the duty of the administrator to have applied for their emancipation. But, by the ratification by the people, of the amendments to the Constitution of the State abolishing slavery, the assent of the sovereign was given, in its most solemn and imposing form, and the complainant, Emily, is now fully emancipated, with the privilege of remaining in the State; and she may now in a Court of Equity, by relation, enforce the rights which accrued to her under the trust,' while in a quasi state of freedom.
Affirm the decree of the Chancellor.'